# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

APOLLO AVIATION GROUP, LLC, AAG Capital
Markets, and Apollo Aviation Management Limited,
     Plaintiffs,

v.                                                                     **JURY TRIAL DEMANDED**

100X, Inc., a Florida limited liability company, and
Jody P. Cohen,

     Defendants.

_____/

## COMPLAINT

Plaintiffs, Apollo Aviation Group, LLC, AAG Capital Markets, LLC and Apollo Aviation Management Limited (collectively, "Apollo"), sue Defendants 100x, Inc. ("100x") and Jody P. Cohen (collectively, "Defendants") for temporary and permanent injunctive relief, monetary damages, and other relief, and allege as follows:

## PRELIMINARY STATEMENT

1.     This is a case about the new management of a service provider upending its longstanding relationship and agreements with Apollo in an attempt to coerce extortionate payments and exert ownership over Apollo's proprietary software by threatening to disruptively cut off its access to the software and proprietary information and systems and to distribute the software to Apollo's competitors or others in the industry.

2.     Over the course of many years, and at a cost of more than $1.2 million, Apollo developed a purpose-built computer program called the Apollo Enterprise Management System ("AEMS"), which is crucial for its business. Apollo uses AEMS to manage virtually every aspect of its business. Years after the project began, Apollo retained Defendant 100x, then

Apollo's information technology ("IT") support provider, to provide engineers who could further execute Apollo's programming instructions. These engineers worked in Apollo's offices at all times under the direct supervision and control of other Apollo employees, using equipment supplied by Apollo, were paid by Apollo, and kept regular 9-5 hours while working for Apollo to further develop AEMS. For over five years, 100x and its proprietor Bill King understood, acknowledged, and agreed that AEMS belonged to Apollo, not 100x. Apollo always conducted business through Mr. King until he passed away in November 2016, at which time Defendant Jody P. Cohen assumed Mr. King's role.

3.      In February 2017, after months of working together, and despite acknowledging Mr. King's agreement that Apollo owned AEMS, Mr. Cohen suddenly and inexplicably claimed that 100x owned AEMS. Unbeknownst to Apollo, Mr. Cohen had engaged in a surreptitious campaign to move AEMS from Apollo's servers to 100x's and cutoff Apollo's access. Mr. Cohen then sought to leverage his ill-gotten control in an attempt to extract a windfall from Apollo in the form of a concession that 100x owns the valuable AEMS program, and a hefty price of $3,000,000 for Apollo to acquire *software it already owns*. Mr. Cohen also attempted to force Apollo under duress to agree to concessions that included paying twice the normal rate for continued services while Apollo transitioned to a new IT service provider and paying half of 100x's balance for its account at the server farm it used to host Apollo's servers, which was substantially in arrears unbeknownst to Apollo. This was particularly shocking, because Apollo paid 100x the funds required to pay this vendor as part of its normal invoices.

4.      Faced with the threat that Defendants would terminate Apollo's access to AEMS and its sensitive business records and/or disrupt the ongoing operation of its IT systems, Apollo was left with no choice but to enter into a Transition Services Agreement ("TSA") with

Defendants under duress.  Otherwise, Apollo's ability to continue doing business would have been jeopardized for a period of time.  Under the TSA, Defendants agreed to facilitate the transition of Apollo's IT systems to a new IT service provider without disruption and to provide Apollo with access to a working version of AEMS—action items that 100x was already obligated to do—in exchange for a windfall payment of $217,000.  Defendants even insisted that Apollo pay a portion of the amounts 100x owed to the server farm used to host Apollo's servers, even though Apollo had already paid 100x money intended for that purpose.  However, given the considerable risk Apollo faced if 100x carried through with its implicit threats to disrupt Apollo's business, it was forced to accede to Defendants' demands.

5.     After months of effort, Apollo recently completed the transition of its IT systems to a new IT service provider and continues to use the version of AEMS provided by Defendants to operate its business.  However, Defendants continue to wrongfully claim ownership of copyright(s) in AEMS and threaten to withhold Apollo's access to AEMS or market AEMS to Apollo's competitors or other third parties if it does not cease use of AEMS or make an unjustified windfall payment to Defendants.  Moreover, Defendants have expressly reserved the option to take AEMS to Apollo's competitors, and have demonstrated an intent to do so. Because AEMS is custom-built for Apollo's business and incorporates numerous proprietary trade secrets regarding the strategy, structure, and operation of Apollo's business, allowing competitors or others in the industry to use this system would cause incalculable harm to Apollo. Thus, 100x and Mr. Cohen have placed Apollo in an untenable situation where a genuine resolution is impossible without this Court's intervention.

6.     This is an action for a declaratory judgment that Apollo owns all copyrights in AEMS and its underlying source code, for a declaration that the TSA and payments made

thereunder are void as Apollo only agreed to the contract under duress, for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* (the "CFAA"), concerning a computer system used in interstate and international commerce, for violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.* (the "DTSA"), and for relief under the law of Florida for causes of action arising from the same set of facts.

## PARTIES

7.     Plaintiff Apollo Aviation Group, LLC is a Florida limited liability company organized and existing under the laws of Florida with a registered office and principal place of business in Miami, Florida.

8.     Plaintiff AAG Capital Markets, LLC is a limited liability company organized and existing under the laws of Delaware with a registered office and principal place of business in Miami, Florida.

9.     Plaintiff Apollo Aviation Management Limited is organized and existing under the laws of Bermuda with a registered office and principal place of business in Dublin, Ireland.

10.    Defendant 100x, Inc. is a corporation organized and existing under the laws of Florida with a registered office and principal place of business in 848 Brickell Ave., Suite 601, Miami, Florida 33131.

11.    Defendant Jody P. Cohen is an individual resident of Florida, residing at 1282 Rialto Way, Suite 101, Naples, Florida 34114.

12.    All conditions precedent to bringing this action, if any, have been performed, excused, or otherwise waived as being futile.

**JURISDICTION AND VENUE**

13.    This Court has federal-question jurisdiction over the subject matter of the claims arising out of 17 U.S.C. § 101 *et. seq.*, 28 U.S.C. § 1030, and 18 U.S.C. § 1836 pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 2201 and 2202.

14.    This Court has ancillary jurisdiction over Plaintiffs' Florida law claims because they arise out of the same nucleus of operative fact.

15.    Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) because 100x resides in the Southern District of Florida and Mr. Cohen resides in Florida, a substantial part of the events giving rise to the claims herein occurred in the Southern District of Florida, and 100x may be found in the Southern District of Florida.

16.    This Court has jurisdiction over 100x because it is a Florida corporation.

17.    This Court has jurisdiction over Mr. Cohen because he is a resident of Florida.

18.    Plaintiffs' IT systems and equipment described below constitute a "protected computer" under the CFAA and "trade secrets" under the DTSA, because they are used in interstate and/or foreign commerce or communication.

**GENERAL ALLEGATIONS**

19.    Founded in 2002, Apollo and its affiliates are a multi-strategy aviation investment manager that seeks to capitalize on its extensive technical knowledge, in-depth industry expertise, and long-standing presence in the mid-life commercial aviation sector.  Apollo and its affiliates manage various investment platforms that invest exclusively in aviation assets.  It has offices in the United States, Ireland, and Singapore.

**Apollo's Proprietary AEMS Software**

20.    Beginning in 2008–2009, Apollo's business began to grow exponentially.  As a result, Apollo found it increasingly difficult to manage the various functions of its business

manually using spreadsheets.  As a result, Apollo began developing a plan to develop the system that would allow it to consolidate and automate its workflows and data management.

21.     On April 2, 2010, Apollo's former Controller Hector Figueras retained a service provider named Pronto Progress ("Pronto") to create software to assist Apollo in managing and processing information related to its aviation business.  Specifically, Apollo directed Pronto to assist with software development, software design, and systems analysis with respect to a database that would enable Apollo to convert various pre-existing accounting and sales data related to its consignment vendors into a common format and run macros to analyze the same.  Pronto worked under the direction and supervision of Apollo to develop this software.

22.     Pursuant to Apollo's agreement with Pronto, all code developed in the course of this relationship belonged to Apollo.  Specifically, Apollo's End User agreement with Pronto, a true and correct copy of which is attached as Exhibit A hereto, provided that Apollo would "own the software developed hereunder."  *Id.* ¶ 4.  At all times relevant hereto, Apollo housed the software created by Pronto on Apollo's servers.  Apollo eventually ended its relationship with Pronto in or around March 2011.

23.     During this time, Apollo also created specific reports, formats, and functionality for incorporation into its software.  For example, Apollo's Director of Origination, Peter Blakeney, who has an engineering background, and John Logan, Apollo's Vice President of Finance, developed a Microsoft Access database that enabled Apollo to identify and track key pieces of information and relationships relevant to all functions of its business (*e.g.*, marketing, sales, senior management reporting, asset management reporting, legal, and insurance).

24.     As another example, Apollo employees Chris Birch and Simon Leader developed a Consignment Reporting and Tracking Module that enabled Apollo to use macros to generate monthly reports for its consignment sales.

25.     As described above, Apollo terminated its relationship with Pronto and, pursuant to the End User agreement, retained ownership of the software Pronto had developed.  Apollo launched its software with Mr. Logan and Mr. Blakeney.  In or around 2012, Apollo decided to seek additional support to further develop and refine its existing software platforms and database systems.

**100x Begins Working with Apollo on AEMS**

26.     100x was formerly owned and operated by Allen Wilbur ("Bill") King.  From 2003 until 2012, Mr. King, 100x, and 100x's predecessor 4Tech Systems, had assisted Apollo with various IT services.  These included the maintenance of Apollo's IT systems and various computers, programs, servers, cloud services, and computing environment ("Apollo Systems") that contain or use Apollo's business records, proprietary information, and trade secrets (the "Apollo Records").  Prior to 2012, neither Mr. King, 100x, nor 4Tech Systems had ever worked with Apollo in a programming capacity or role that related to any of Apollo's proprietary software platforms and database systems.

27.     In or around August 2012, upon learning that Apollo had stopped working with Pronto and was seeking help with developing and refining its proprietary software platforms and databases and systems, Mr. King proposed working with Apollo.  Specifically, Mr. King proposed to help develop a consolidated platform that would incorporate Apollo's existing database systems, modules, code, and ideas that were already developed by Pronto, Mr. Birch, Mr. Leader, Mr. Blakeney, and Mr. Logan.

28.     Apollo worked with Mr. King to reproduce in the consolidated platform the same structure, workflows, and output of these pre-existing software platforms and database systems, including the specific design parameters previously created by Apollo. On information and belief, Mr. King used code created by Apollo's employees in developing this consolidated platform.   Additionally, Mr. King generally worked on this project in Apollo's office using equipment provided by Apollo over the course of two months to develop this project.   Mr. King worked under the direct supervision of Apollo employees, including Robert Korn, Apollo's President, on this project.

29.     At all times relevant hereto, Mr. King acknowledged that Apollo was the sole owner of its existing software platforms and database systems, including all code and all future iterations or variations thereof.

30.     After completing the consolidation project, Apollo decided to continue working with Mr. King and 100x on further supporting the consolidated platform.   Apollo selected software engineers from a pool of potential candidates provided by 100x, who would work onsite at Apollo's offices under the direction and control of Apollo's employees.   Apollo set the budget for hiring these engineers.   Apollo paid 100x for the software engineers in an amount equal to cost, plus a markup for 100x's profit.   These engineers generally worked regular business hours in Apollo's offices in Miami for extended periods of time.   The engineers were required to be available to execute whatever tasks Apollo employees would assign to them on an ongoing basis. To do the work, Apollo supplied the engineers with computers, equipment, offices, desks, work phones and meals.   The engineers attended Apollo sponsored events and holiday parties, ran as Apollo employees in the Mercedes-Benz Corporate Run Series, and Apollo included the engineers on internal distribution and birthday lists.   Apollo paid these engineers biweekly for at

least the last four years.  Apollo maintained the right to terminate the engineers and, on at least one occasion, exercised that right.  In other words, while 100x managed some administrative responsibilities, the engineers were Apollo employees.

31.     Not surprisingly, the developers provided to Apollo by 100x held themselves out to the public as employees of Apollo Aviation Group and continue to hold themselves out to the public as Apollo's former employees.  For example, as of May 31, 2017, the LinkedIn profile of Elian L. Fernandez de la Pera reflected that he was employed by Apollo from December 2014 through January 2017 as a Full Stack Developer.  A true and accurate copy of his profile as of May 31, 2017 is provided below:



On information and belief, upon learning of this potential lawsuit, Mr. Fernandez updated his LinkedIn profile to eliminate any reference to Apollo.  A true and accurate copy of his profile as it currently appears is provided below:





**Full Stack Developer**
100X, Inc
Dec 2014 – May 2017   • 2 yrs 6 mos
848 Brickell Avenue Suite 601

• Implementing a fully integrated business software solution and leading source for best practices through the industry and provide an exceptional platform for collaboration among users in the aviation industry.
• Implementing a collaborative software system to organize and integrate companies, projects, tasks, events, teams and people in one place.
• VB.NET Desktop Applications (Analysis, Database Access Object, user-friendly and detail-oriented custom win-form designs which improve the bottom line through optimized productivity, custom user controls, programming techniques, algorithms, optimization, agile software development methodologies, LINQ, etc.)
• WCF Service-Oriented Application
• SQL Server 2012 - 2014 (Design, Stored Procedures, Functions, Triggers, Views, Queries, etc.)
• SSRS, Report Builder.
• Self-taught about Android Application Development.

Available at https://www.linkedin.com/in/elian-l-fernandez-de-la-pera-b338b974/ (last visited June 6, 2017).

32.    Similarly, a true and correct image from the LinkedIn profile of Gabriela Guasch reflecting that from February 2013 to February 2017 she was employed by Apollo as a Lead Software Developer is provided below:



Available at https://www.linkedin.com/in/gabriela-guasch-a3241535/ (last visited June 6, 2017).

33.    At the same time, Apollo's permanent employees continued to develop significant volumes of code for use in the operation of Apollo's business.  For example, an Apollo employee named Donal McGowan developed Maintenance Tracking, Technical, and Fleet Management

modules for the platform.  The engineers provided by 100x only conducted quality control work to ensure integration into the platform and provided ongoing technical support related thereto.

34.     Apollo employees also gave the engineers supplied by 100x specific instructions to develop and integrate various modules into Apollo's platform that were designed to automate and streamline Apollo's existing workflows and data management processes.  For example, a team of Apollo employees led by Apollo's Chief Financial Officer, Javier Meireles, gave the engineers provided by 100x detailed instructions to create a Purchase Order and Invoicing module based on Apollo's existing workflows to incorporate into Apollo's software.

35.     Similarly, Mr. Meireles and Apollo's Vice President of Accounting, Eric Blanco, instructed the engineers provided by 100x to develop a Tax Notice module designed to automate the process of processing and responding to tax notifications based on Apollo's existing practices and workflows.

36.     Apollo also instructed the engineers provided by 100x to develop a Transaction Origination module (for assisting in purchasing assets) based on spreadsheets created by Mr. Blakeney and Mr. Korn, as well as a marketing module (for tracking leasing and sales transactions) based on the Transaction Origination Module.

37.     Apollo's Director of Technical Services, Jerry Reyes, and Technical Manager, Lazaro Alfonso, developed various macros designed to track Apollo's planes, parts, and maintenance activities that formed the foundation of additional technical modules, as well as designing the form and functionality of a module designed to facilitate the approval of export requests.  Various additional modules related to Apollo's legal, compliance, and transactional workflows, among others, were created at Apollo's direction under similar methods.

38.     The integrated platform owned and developed by Apollo, and at times with the assistance of the engineers supplied by 100x under the direct supervision of Apollo, became collectively known as the "Apollo Enterprise Management System" or AEMS.

39.     AEMS is based on and derived from Apollo's proprietary information, and purpose-built for Apollo's specific workflows and data management.  Virtually every aspect of AEMS is highly technical and specific to the aviation industry and Apollo's proprietary practices and workflows.  Accordingly, Apollo was greatly involved and invested heavily in developing AEMS.  On information and belief, neither Mr. Cohen, 100x, nor any of the engineers supplied to Apollo by 100x have any experience in the aviation or accounting industries.  As a result, and due to the idiosyncrasies of the platform, data, and industry, the engineers provided by 100x could not work to develop AEMS without Apollo's specific guidance and direction at all times.

40.     The engineers supplied by 100x worked hand-in-hand with Apollo's employees onsite at Apollo's offices in Miami.  The engineers, as well as all employees of 100x, were required to execute electronic attestations to abide by Apollo's Code of Ethics and Compliance Manual, which included confidentiality and non-disclosure obligations and fiduciary duties to Apollo and its clients.  They were also subject to background checks, like all Apollo employees.

41.     The engineers supplied by 100x worked at the direction of Apollo's employees under their close supervision at all times and in parallel with Apollo employees' own programming efforts.  For example, as discussed above, Mr. McGowan wrote code for Technical and Fleet Management modules for AEMS, and provided close direction and supervision to the engineers provided by 100x working to support the creation of these modules and their integration into AEMS.

42.    Since its inception, Apollo has spent more than $1.2 million in developing the proprietary platform that comprises AEMS, not including the countless man-hours expended by Apollo's employees to develop components of AEMS and to direct and supervise the work of Pronto and the engineers provided by 100x.

43.    AEMS embodies a series of original, creative choices, which feature unique or independently created expression that is the product of Apollo's discretion, skills, resources, and creative energies.  AEMS was developed over a number of years and at significant cost in terms of manpower, time, and expenditures.   Therefore, these materials constitute copyrightable subject matter under the laws of the United States.

44.    A true and correct image of the opening screen for AEMS is depicted below:



### Apollo's Ownership of the AEMS Platform

45.     Apollo owns a valid and subsisting copyright in AEMS and registered its copyright with the United States Copyright Office on March 8, 2017.  Apollo is the sole owner of Copyright Registration No. TXu002025527.  A true and correct copy of this Certification of Registration is attached hereto as Exhibit B.

46.     At all times, Bill King, the owner of 100x, acknowledged and understood that all right, title, and interest to AEMS belonged solely to Apollo, and confirmed this understanding repeatedly in conversations with various Apollo employees, including Clif Dameron, Bill Hoffman, Javier Meireles, and Robert Korn.

47.     Until Mr. King's untimely death in November 2016, no one at 100x ever claimed to own any part of AEMS, much less the entire platform.  For example, on October 17, 2013 Mr. King prepared at Apollo's request a description of AEMS that Apollo could use to explain the system to Apollo's stakeholders.  A true and correct copy of Mr. King's description is attached as Exhibit C hereto.  Mr. King wrote that "*Apollo has developed* a system that supports the unique business model and business objectives of the organization."  *See id.* at 2 (emphasis added).

48.     AEMS has borne a copyright legend similar to the one that appears on the current main page consisting of Apollo's logo followed by the text "Copyright © 2016, Apollo Aviation Group, LLC - AEMS."  In fact, *100x engineers inserted that legend*.  True and correct screen captures of the AEMS main page with annotation showing the location of the copyright legend, and the legend itself are shown below:





49.     No one at 100x ever disputed the accuracy of this copyright notice, or any similar copyright notice, or took any steps to modify or alter this copyright notice despite having the ability to do so.  In fact, at the annual investor meetings in which 100x participated as Apollo's IT service provider, Apollo repeatedly informed its investors that it owned AEMS, and 100x never objected.

50.     100x never purported to license AEMS or to charge any license fees with regard to AEMS.  100x has never invoiced Apollo for a license to use AEMS, and prior to February 2017, neither Mr. King, Mr. Cohen, nor anyone else at 100x ever asked Apollo to take a license to use AEMS or disputed Apollo's ownership of the same.

51.     100x invoiced, and Apollo paid a per-user fee for troubleshooting and support related to AEMS.   100x separately invoiced, and Apollo paid fees associated with, ongoing development work for AEMS, but never for a license.

52.     On information and belief, 100x never applied for a copyright registration on AEMS.

53.     On information and belief, Mr. Cohen never applied for a copyright registration on AEMS.

**Mr. King Requests the Ability to License an
"Agnostic" Version of AEMS to Third Parties**

54.     In or around late 2014 or early 2015, Mr. King asked Apollo for a license to AEMS that would enable him to convert AEMS into "agnostic" software, omitting the wealth of confidential and proprietary Apollo information contained therein, which 100x could eventually license to third parties outside of the aviation industry.

55.     In or around 2016, Mr. King again raised the possibility of turning AEMS into "agnostic" software under a license from Apollo with Clif Dameron, Apollo's Chief Compliance Officer and Senior Vice President, who referred him to Bill Hoffman, Chairman of Apollo. However, the parties never reached an agreement for Mr. King or 100x to develop this software or otherwise altered their prior agreement that Apollo was the sole owner of AEMS.

56.     Concurrently, in or around 2015 and 2016, Apollo and Mr. King discussed executing a Software Development Agreement ("SDA") and Master Services Agreement ("MSA") to formalize their agreement that Apollo owned AEMS.   Notably, every draft exchanged between the parties clearly reflected the long-standing agreement between Apollo and 100x that Apollo was the sole owner of AEMS, and there was no debate or negotiation between the parties on this point.   Indeed, drafts of these agreements provided on May 15, 2016 and July

17

19, 2016 by Bill King on behalf of 100x to Apollo included explicit language reflecting that, consistent with the parties' prior agreement, Apollo would retain sole ownership of all intellectual property rights in AEMS and that AEMS would be the sole and exclusive property of Apollo.  Mr. Cohen was Cc'd on this correspondence and did not raise any objection.  At no point in time did anyone associated with 100x raise any objection to this arrangement or suggest it was inconsistent with the parties' prior agreements related to AEMS.  Unfortunately, the parties were unable to finalize these agreements due to the death of Mr. King and his successors' eventual new claims of purported ownership, as discussed more fully below.

**Mr. King Passes Away and
Mr. Cohen Assumes Control of 100x**

57.     After working together for more than a decade in various capacities, Apollo and Mr. King had a close, special working relationship unlike any other vendor of Apollo.  On November 1, 2016, Mr. King turned 55 and Apollo's Chairman, Bill Hoffman, emailed Mr. King from Hong Kong to wish him a happy birthday.

58.     In early November 2016, Mr. King suddenly and unexpectedly passed away. Apollo learned of Mr. King's passing on November 12, 2016.

59.     Originally, Apollo understood that Mr. King was the only owner of 100x, and he was the primary interface with Apollo.  Apollo had no dealings with Mr. Cohen until in or around 2012 when Mr. King introduced Apollo to Mr. Cohen, presenting him as his nephew and an individual that was responsible for supervising computer maintenance technicians with experience as a security and network engineer.  From 2012 until Mr. King's passing in November 2016, Mr. Cohen had minimal involvement in the ongoing development of AEMS. Upon information and belief, Mr. Cohen's background and experience were more suited to IT security and network infrastructure with no programming expertise.

60.     Mr. Cohen met with Javier Meireles of Apollo on November 21, 2016, and claimed to be the sole decision-maker for 100x.  Mr. Cohen indicated his desire to continue working with Apollo to provide IT services and support for AEMS.  Mr. Meireles indicated Apollo's willingness to continue their relationship and the need for Mr. Cohen to ensure a back-up plan given Mr. King's recent passing.  In other words, Apollo needed to know who it could contact in the unfortunate event that something happened to Mr. Cohen.  Mr. Cohen assured Mr. Meireles that there was a back-up plan and also that there were no estate issues regarding the transfer of ownership of 100x to Mr. Cohen.  Mr. Cohen did not suggest that he or 100x had any ownership interest in AEMS.

### Mr. Cohen Claims for the First Time to Own AEMS

61.     On January 16, 2017, Mr. Cohen arranged a meeting with Mr. Hoffman over coffee.  At the meeting, Mr. Cohen asked Mr. Hoffman about the possibility of licensing AEMS to other companies.  Mr. Hoffman made clear to Mr. Cohen that Apollo was the sole owner of AEMS and that it was not interested in pursuing this idea.  At no point in time did Mr. Cohen contradict Mr. Hoffman or make any claim of ownership to AEMS.

62.     On the morning of Wednesday, February 8, 2017, Mr. Cohen had a meeting at Apollo's offices with Mr. Hoffman and Mr. Dameron.  Mr. Hoffman and Mr. Dameron were insistent that Mr. Cohen finalize the SDA and MSA, which reflected both 100x's duties and obligations to Apollo and the parties' long-standing and mutual recognition of Apollo's ownership of the AEMS platform.  Mr. Hoffman instructed Mr. Cohen to make finalizing these agreements his sole priority and to disregard any other tasks that Apollo employees may assign to him.

63.     During this meeting, Mr. Cohen acknowledged and agreed that Mr. King had agreed that Apollo was the sole owner of AEMS and said "I wish he would have consulted me

on that decision."  Nonetheless, Mr. Cohen seemed to suggest he would not honor Mr. King's and 100x's long-standing agreement with Apollo.  Then, Mr. Cohen asserted, for the first time, that Mr. King could not make that decision without Mr. Cohen's approval.

64.    Mr. Cohen's statements surprised Apollo.  On information and belief, Mr. Cohen was not the decision-maker for 100x before Mr. King passed away.  Moreover, Mr. King never indicated in his numerous discussions with Apollo over many years that Mr. Cohen's consent was necessary to confirm Apollo's sole ownership of AEMS.  Later that afternoon, Mr. Meireles reached out to Mr. Cohen to inquire regarding the substance of Mr. Cohen's earlier meeting with Mr. Hoffman and Mr. Dameron.   During this conversation, Mr. Cohen wanted to explore licensing and/or joint ownership of AEMS, thereby implicitly disputing Apollo's sole ownership of AEMS.

**100x Attempts to Extort Apollo by Restricting Access to AEMS, and
Threatens to Take AEMS to Apollo's Competitors**

65.    On or around February 9, 2017, 100x cut off Apollo's access to the source code for AEMS.  On information and belief, this source code was initially stored on Apollo's servers, but 100x disabled Apollo's access to its servers and restricted Apollo's access to its own source code.

66.    On February 10, 2017, Mr. Cohen suddenly began issuing unilateral demands while leveraging his ill-gotten control of AEMS and the fact that he effectively had control over the Apollo Systems and the Apollo Records.  Mr. Cohen represented that the parties were "too far apart," it was clear that they could no longer work together, and they must sever their relationship.   To be clear, Mr. Cohen terminated the relationship with Apollo.   For an "uninterrupted and seamless technology transition," Mr. Cohen made an extortionate demand that Apollo pay $3,000,000 to acquire the copyrights for AEMS and Xfea, and pay $75,000 per

month for an "estimated" period of two to six months to transfer to Apollo the physical infrastructure, Apollo Systems, and the Apollo Records.  A true and correct copy of this demand is attached as Exhibit D hereto, and excerpted below:

<u>Proposal to Transfer Software & Computing Environment to AAG</u>

100x to transfer copyrights of AEMS & Xfea to AAG

100x to transfer physical infrastructure & entire computing environment (virtual machines, configurations, settings, etc.) to AAG

100x to provide continued supported, continued software development, training, uninterrupted & seamless technology transition of all 100x managed & hosted services to new AAG on-premises/colocation environment and/or service provider, full documentation of systems architectures

AAG to pay $3,000,000 one-time fee

+

AAG to pay $75,000 per month (length TBD ahead of time for transition, estimated 2-6 months)

+

AAG to pay all current and past-due invoices

67.     Mr. Cohen further indicated that if Apollo did not agree to his terms he would withdraw hosting and support to, and refuse to relinquish possession of, AEMS, the Apollo Records, and the Apollo Systems.  This would cause Apollo to suffer severe business interruption for a period of time.  Mr. Cohen offered to simply provide Apollo with its data in raw format, which would have required significant work to make the data useable.

68.     In response, Apollo repeated that it owned AEMS and insisted that 100x not modify, delete, or limit or deny Apollo's access to AEMS, the Apollo Records, or the Apollo Systems.

69.     In the afternoon on February 10, 2017, Mr. Cohen met with Mr. Meireles and Mr. Dameron in order to negotiate a resolution of this dispute.  Apollo said that it wanted to separately negotiate an orderly transition of the Apollo Systems from 100x to a new vendor

before addressing the question of ownership of AEMS.  Mr. Cohen responded that he "wanted to do the right thing for everyone" and cooperate with Apollo to complete an orderly transition.

70.     Nevertheless, Mr. Cohen unilaterally demanded immediate payment for what he deemed to be "past due" invoices, which Apollo had no choice but to pay given the risk that Defendants could unilaterally cut off Apollo's access to AEMS, the Apollo Records, and/or the Apollo Systems at any time.

71.     Mr. Cohen then offered to work with Apollo's new service provider to transition its data (*e.g.*, SAGE, AEMS data, flat files and email databases).  He offered to copy Apollo's data to removable storage and to deliver to the new service provider.  Also, he offered for a flat fee a full "turn-key" transition of Apollo's Systems.  In order to compensate 100x for its work on the transition process, Apollo offered to pay Mr. Cohen a transition fee of $100,000, as an advance on 100x's going rate.  Without any basis, Mr. Cohen countered at $250,000.  The parties agreed on $200,000.  Apollo accepted these terms—which are twice 100x's going rate—even though Mr. Cohen was forcing them to negotiate under duress.  If Apollo had refused to agree to these terms, it risked losing access to its entire IT system, which would have resulted in considerable and irreparable harm to its business that relied on these systems to function. However, during this conversation, Apollo was clear that ownership of AEMS was a separate issue from the transition process and that it would not discuss the ownership of AEMS until the transition was complete.  Mr. Cohen agreed to proceed on these terms, and the parties began work on a simple transition agreement reflecting the agreed terms.

72.     That same day, Mr. Cohen and Mr. Meireles held another meeting with Apollo's new IT service provider.  During this meeting, Mr. Cohen indicated that in order to complete the transition he needed to place Apollo's virtual servers onto Apollo's physical server and remove

other third parties' virtual servers from Apollo's physical server.  Apollo was shocked to learn that 100x had been placing third-party information on Apollo's servers without Apollo's knowledge or consent.

73.     Over the weekend, Apollo worked diligently to reduce to writing the Transition Services Agreement with 100x that the parties had negotiated on February 10, 2017.  Apollo forwarded the draft to 100x on February 13, 2017.

74.     On the afternoon of February 13, 2017, Apollo met with Mr. Cohen to discuss the Transition Services Agreement.  Mr. Cohen stated that he was uncomfortable signing anything and said he would revert after discussing with his attorney.  Nonetheless, for a time, Mr. Cohen continued to work with Javier Meireles to coordinate on a transition.  During these discussions, Mr. Meireles again reiterated that Apollo was the sole owner of AEMS consistent with the history of the parties' dealings and Apollo's long-standing agreement with Mr. King.  Mr. Cohen acknowledged that Mr. King had this agreement with Apollo, but that as the new owner of 100x, he was changing that position.

75.     On February 21, 2017, and without warning, 100x responded with a demand letter from its counsel.  A true and correct copy of that letter is attached as Exhibit E hereto.  In this letter, 100x asserted ownership of AEMS and provided five "options" that required Apollo to renounce ownership of AEMS and (a) pay $3,000,000 to acquire it from 100x, (b) take a license from 100x, or (c) abandon all use.  Further, unbeknownst to Apollo, 100x was substantially in arrears with the data center it used to host Apollo's servers, and 100x insisted that Apollo pay 50% of 100x's delinquent bills—amounting to an additional $17,000.  Apollo was shocked to learn that 100x had failed to make payments to the data center hosting Apollo's servers, as

Apollo had provided 100x with money to pay those bills each month, and it was understood that 100x was responsible for ensuring that these bills were paid.

76.     100x's letter concluded by threatening to cut off service and access to AEMS, the Apollo Systems, and the Apollo Records if Apollo did not respond by February 23, 2017. Further, if Apollo responded but did not agree to the terms unilaterally proposed by 100x's counsel, 100x threatened to "cease to render further service, support, or hosting."  In other words, unless Apollo caved in to 100x's demands, 100x threatened to immediately shut off Apollo's access to AEMS, the Apollo Systems, and the Apollo Records, effectively preventing Apollo from engaging in any ongoing business with its customers.  This would have a material and adverse impact on Apollo's business, rendering it difficult for it to service its customers without an incredible amount of work and expense for a period of time.

77.     On February 22, 2017, Apollo sent a letter reiterating the need for an orderly transition of the Apollo Systems and that the Apollo Records was a separate issue from 100x's newfound assertion that it owned AEMS.  100x represented Mr. Cohen's belief that 100x would have charged $5,000,000 to develop AEMS and that it was banking on the continued relationship with Apollo to recoup the difference between that sum and what Apollo had paid so far to 100x.

78.     This statement shocked Apollo.  As an initial matter, Mr. Cohen terminated the relationship with Apollo, not the other way around.  Moreover, the MSA and SDA the parties were previously negotiating—which unequivocally confirmed Apollo's sole ownership of AEMS—only offered 100x between four and nine months of guaranteed compensation at a rate of $75,000 a month.  This total compensation of $300,000 to $675,000 dwarfed the mid-seven figure payments 100x and Mr. Cohen were suddenly demanding to confirm Apollo's sole ownership of AEMS.  Further, Apollo began developing AEMS in 2010, two years before 100x

ever became involved, and four years before Mr. Cohen took over for Mr. King. By the time 100x was involved, Apollo had already completed substantial work, including developing the core AEMS code and functionality. Moreover, Mr. King never mentioned anything of this sort when he approached Apollo to work on AEMS, nor at any time before his death. Importantly, Apollo had always paid the engineers provided by 100x at cost plus a margin for 100x's profit, so 100x had already fully recouped its costs *and* earned a substantial profit. Additionally, Apollo paid all development costs for AEMS, totaling $1.2 million, which included costs and profits already paid to 100x, in addition to Pronto. Nevertheless, Mr. Cohen apparently insisted that, contrary to the history of the development of AEMS, he was somehow entitled to *additional profits* that are *multiples* of the total cost of AEMS, despite only being active on the project for three months.

79.     That same day, Mr. Meireles participated in a further meeting with Mr. Cohen in an effort to secure 100x's cooperation in achieving a peaceful transition. During this meeting, Apollo was shocked to see *a printed list of the Top 50 aircraft lessors* sitting on Mr. Cohen's desk. On information and belief, 100x does not presently work with any of these companies, many of which are Apollo's competitors. Thus, there is no reasonable explanation for 100x to possess such a list unless it has provided, or plans to provide, Apollo's competitors with AEMS. On information and belief, 100x has caused and will continue to cause damage to Apollo by representing that 100x owns AEMS and offering to distribute or provide services to those competitors utilizing AEMS.

80.     Throughout numerous exchanges between the parties, 100x repeatedly made representations, then reneged on them. Most importantly, in a teleconference on February 24, 2017 between counsel for the parties, 100x repeatedly recognized that the parties were

continuing to discuss ownership and/or licensing of AEMS but that it would take time to resolve that dispute.  100x's counsel repeatedly represented that: (1) 100x would not do anything to disrupt Apollo's business; (2) 100x would maintain all services until the question of AEMS ownership is resolved, so long as Apollo continued to make payments at the historic rate for hosting and troubleshooting; (3) Apollo could immediately and without charge backup its data, databases, and records; and (4) Mr. Cohen and 100x would not market, distribute, license, or otherwise use AEMS with any third parties until the issue of ownership is resolved.  That same day, Apollo sent a confirmatory email to memorialize the same, and 100x expressly refused to confirm *any* of its representations.

81.     Instead, 100x's response doubled down on its prior, unilateral "take-it-or-leave-it" demands.  After cutting off Apollo's access to the source code for AEMS and holding it for ransom, 100x again insisted that Apollo abandon and waive its ownership claim and purchase or license AEMS at exorbitant rates.  If Apollo refused, 100x threatened to leave Apollo without its crucial AEMS software that it had developed at substantial time and expense after the completion of the transition to Apollo's new service provider.

82.     After weeks of intense negotiations held under the threat of Apollo losing access to AEMS, the Apollo Systems, and the Apollo Records, Apollo was left with no choice but to agree to 100x's extortionate demands.  Under a Transition Services Agreement ("TSA") executed on March 17, 2017, Apollo agreed under duress to pay 100x $217,000 to secure the "full turn-key transition and migration" of the Apollo Systems and Apollo Records to a new service provider.  100x also agreed to provide Apollo with a compiled version of AEMS but refused to return possession of the AEMS source code to Apollo.  The parties expressly agreed that "neither Party waives any rights that it has or may claim with respect to ownership of the

intellectual property rights in AEMS, and each party hereby reserves all rights with respect thereto."

83.     On April 25, 2017, Apollo learned that 100x was planning for the first time to attend the Aviation Week MRO Americas conference in Orlando, Florida that was taking place that week.  Apollo was shocked, as 100x had never previously attended this conference or any other aviation-related conference for that matter.  Moreover, Apollo was deeply concerned that 100x may use the conference as an opportunity to market Apollo's AEMS software and the proprietary information and trade secrets contained therein to competitors, as virtually all of Apollo's competitors attend this conference.  Apollo's concerns were heightened by its previous discovery that Mr. Cohen maintained printed records regarding the identity of Apollo's primary competitors.

84.     As such, Apollo contacted 100x's counsel that same day to remind them that Apollo owns a valid copyright in AEMS, that AEMS embodies numerous trade secrets and proprietary business practices of Apollo, and that any effort on the part of 100x or Mr. Cohen to solicit buyers, users, or licensees of AEMS as, inter alia, copyright infringement, a violation of the Defend Trade Secrets Act and Florida Trade Secrets Act, and a violation of the Florida Deceptive and Unfair Trade Practices Act.  Dodging the broader assertions, 100x's counsel responded only that it was "fully aware of its rights and obligations under the TSA, and continue[s] to act in accord therewith."

85.     During the transition, Apollo learned that 100x's misdeeds extended even further than it previously knew.  For example, Apollo has learned that, during its time as IT service provider, 100x was using Apollo's servers and hard drives for use in its business to host services and store data related to other 100x customers without Apollo's permission.  On information and

belief, over the years 100x has misled Apollo regarding its hardware needs, convincing Apollo to buy unnecessary hardware that 100x intended to use to support its other clients. Moreover, the network infrastructure developed by 100x was shoddy and prone to errors that resulted in unstable systems. During the transition and since, Apollo has been forced to spend substantial resources unravelling the mess created by 100x and bringing its network infrastructure into compliance with industry best practices. This issue was exacerbated by the fact that 100x failed to maintain adequate documentation regarding the structure and operation of the Apollo Systems consistent with industry best practices.

86.     Similarly, Apollo has learned that 100x failed to pay other third-party service providers that provided support to the Apollo Systems, including DUO. Indeed, Apollo learned on May 8, 2017 that its DUO account was on the verge of being cutoff due to non-payment, because 100x had failed to make payments since September 2016. Disconnection of this service would have locked Apollo out of the Apollo Systems and crippled its ability to continue operating its business. Apollo was shocked by this development as it provided 100x with money intended to pay for these services but was forced to make a payment to DUO of approximately $2,400 to avoid disconnection.

87.     On May 8, 2017, Apollo completed its obligations under the TSA by remitting the final payment owed to 100x after the successful transition of the Apollo Systems and Apollo Records to the control of its new IT service provider. However, 100x continues to refuse to acknowledge Apollo's ownership of AEMS, has refused to return the source code for AEMS that was removed from Apollo's servers without authorization, and has threatened to market AEMS to Apollo's competitors unless Apollo pays the ransom it demands.

**Apollo's Injury**

88.     AEMS is a proprietary system, process, program, and framework that is confidential and extremely valuable.  It contains and manages Apollo's highly confidential business information, including the Apollo Records.  AEMS embodies intellectual processes and know-how that are the product of many thousands of hours of development and approximately $1.2 million in development costs.

89.     Commencing in February 2017, 100x wrongly asserted ownership of AEMS and threatened to abruptly and permanently discontinue providing services that allow Apollo to access and use AEMS, the Apollo Records, and the Apollo Systems.

90.     This threat is and was willful, malicious, intended to injure Apollo and its business, and to extort money from Apollo.  This intent is evidenced by the Defendants having made an unprecedented and extortionate demand for millions of dollars in order to allow Apollo to continue accessing its own software and operating its business.

91.     AEMS derives its independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

92.     Apollo has reasonably endeavored to maintain the secrecy of AEMS since the onset of its development by limiting the number of individuals who have access to them, and shielding them from the public and competitors who could derive value from their exploitation and use.

93.     The marketability of Apollo's implementation of AEMS will be destroyed if it is misappropriated, disclosed, or otherwise acquired by improper means.

94.     As a contractor entrusted with access to Apollo's highly confidential information, and having been given access to Apollo's secure systems and business information, 100x and

Mr. Cohen stood in a position of special trust and confidence with their employer, Apollo, which was also the owner of AEMS. The fact that Mr. Cohen and all engineers or contractors provided by 100x executed agreements to be bound by the Code of Ethics and Compliance Manual of Apollo Aviation Holdings Limited and its subsidiaries (including Plaintiffs) further confirms this relationship. 100x and Mr. Cohen therefore owe a fiduciary duty, in addition to an employee's normal duties of loyalty and good faith, to their employer Apollo and its investors.

95. The value of the trade secrets embodied by or contained in AEMS does not have a readily ascertainable market value at this time. Their reasonable value is represented by more than a million dollars and countless man-hours that Apollo invested in creating it and the damage Apollo will suffer by reason of losing an advantage over those who do not know of or use the trade secrets comprising it and embodied therein.

96. Further, Defendants' misappropriation of Apollo's trade secrets embodied in AEMS will destroy their value. Apollo will not only lose the opportunity to use AEMS for its own business, but if Defendants publish, transfer, or reveal them to third parties, their entire value and uniqueness will be lost.

97. Such harm would not be redressable by a money judgment for damages or other remedy at law, since the disclosure or sale to another party of AEMS could immediately and totally destroy their value to Apollo, and it will lose all rights to profit from its development and marketing in the future. Accordingly, any remedy at law would be inadequate.

98. Apollo's rights in AEMS are clear. Regardless of what grievances the Defendants may claim, they do not have a legal right to interfere maliciously and destructively with Apollo's business and property rights or to seek unjustified windfall payments from Apollo under duress.

99.    Apollo has reasonably relied on Defendants' representations and past conduct, which suggested that Defendants would act in good faith and not interfere with Apollo's access to AEMS and the data contained therein.  As Defendants have blocked Apollo's access to AEMS source code, and threatened to block, limit, or disrupt access to AEMS, Defendants have breached, or will breach their agreement, express or implied, and Apollo has relied on Defendants' representations that they would act in good faith to its detriment.

100.    Nothing permits Defendant to appropriate and exercise dominion over AEMS, the Apollo Systems, or the Apollo Records or to interfere with their development and implementation without Apollo's consent.  Yet Mr. Cohen and 100x illicitly copied AEMS to 100x's server and then deleted or modified the copy on Apollo's server so that they could exercise unilateral control over AEMS.  In essence, Mr. Cohen and 100x seek to coerce Apollo into handing over its ownership of AEMS by denying Apollo access to the AEMS source code, and limiting or denying Apollo's access to AEMS.

101.    The counts pled in this Complaint, and the damages being suffered by reason of Defendants' conduct, occurred and continue to occur in Florida, are contrary to the public policy of Florida, and are redressable in this Court pursuant to Florida law.

102.    It will not disserve the public interest to prevent Defendants from extorting Apollo, appropriating Apollo's proprietary AEMS platform, disruptively discontinuing Apollo's rightful access to and use of the same, and preserving the status quo until either this Court can confirm Apollo's ownership of the same, or the parties can resolve the AEMS ownership dispute without Apollo operating under the threat of an unjustified disruption to its business operations.

## COUNT I
## COPYRIGHT INFRINGEMENT

103.     Apollo repeats the allegations of Paragraphs 1 through 102 as though fully set forth herein.

104.     Apollo is the owner of all copyrights in AEMS and all underlying source code, and has never assigned, licensed, or otherwise transferred its copyrights to any of the Defendants.

105.     Apollo is the sole owner of U.S. Copyright Reg. TXu002025527 covering the "Apollo Enterprise Management System."   A true and correct copy of this Certification of Registration is attached hereto as Exhibit B.

106.     On information and belief, Defendants do not own any copyright registrations covering AEMS and its underlying source code.

107.     On information and belief, Defendants made copies of the source code embodying AEMS without authorization, violating Apollo's exclusive right to reproduce copies of AEMS.

108.     On information and belief, Defendants transferred source code that was initially stored on Apollo's servers and transferred the source code to 100x's servers.

109.     On information and belief, Defendants have sold or licensed or attempted to sell or license AEMS to third parties, violating Apollo's exclusive right to publish and distribute AEMS.

110.     On information and belief, Defendants have created derivative works based on AEMS that they have sold or licensed or have attempted to sell or license to third parties.

111.     The foregoing acts by Defendants constitute infringement of Apollo's copyright in AEMS in violation of 17 U.S.C. § 501, *et. seq.*

112.    Defendants' infringement was willful as they had full knowledge of Apollo's ownership and rights but continued to infringe.

113.    Apollo has suffered damages as a result of Defendants' infringement.

## COUNT II
## THEFT OF COMPUTER DATA
## 18 U.S.C. § 1030(a)(2)(C)

114.    Apollo repeats the allegations of Paragraphs 1 through 102 as though fully set forth herein.

115.    Defendants have knowingly and intentionally accessed Apollo's protected computers without authorization, or have exceeded authorization due to having accessed the systems for improper purposes, and have thereby obtained information therefrom; specifically, the source code for AEMS, and the identities of the files Defendants have modified or deleted, or threatened to modify or delete, as well as the passwords and encryption codes that have locked out Apollo.

116.    The system, the computers, and the software obtained involve interstate and/or foreign communications.

117.    The damage resulting from Defendants' conduct will be more than $5,000 in a one-year period.

118.    The foregoing is a violation of 18 U.S.C. § 1030(a)(2)(C) and subjects Defendants to a civil action for injunctive relief, compensatory damages, or other equitable relief pursuant to 18 U.S.C. § 1030(g).

## COUNT III
## UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD
## 18 U.S.C. § 1030(a)(4)

119.    Apollo repeats the allegations of Paragraphs 1 through 102 as though fully set forth herein.

120.     Defendants have, knowingly and with intent to defraud, accessed Apollo's protected computers unlawfully without authorization, or have exceeded authorized access due to having accessed the systems by dishonest methods and for improper purposes.

121.     The object of the fraud beyond accessing the protected computers was to extort ownership of valuable AEMS software, as well as a blackmail payment of $3,000,000 or exorbitant licensing fees, in exchange for uninterrupted access to Apollo's own software and use of AEMS.

122.     The value of the use of AEMS, as well as 100x's efforts to extort Apollo, are more than $5,000 in a one-year period.

123.     The system, the computers, and the software obtained involved interstate and/or foreign communications.

124.     The foregoing is a violation of 18 U.S.C. § 1030(a)(4) and subjects Defendants to a civil action for injunctive relief, compensatory damages, or other equitable relief pursuant to 18 U.S.C. § 1030(g).

**COUNT IV**
**UNAUTHORIZED ACCESS RESULTING IN DAMAGE TO COMPUTER SYSTEM**
**18 U.S.C. § 1030(a)(5)**

125.     Apollo repeats the allegations of Paragraphs 1 through 102 as though fully set forth herein.

126.     Defendants have knowingly caused the transmission of programs, information, codes or commands, and as a result of such conduct, (i) intentionally have caused or will cause damage, without authorization, to Apollo's protected computer systems; (ii) intentionally have accessed or will access Apollo's protected computer systems without authorization, and as a result of such conduct, have recklessly caused or will cause damage to them; and (iii)

intentionally have accessed or will access Apollo's protected computer systems without authorization, and as a result of such conduct, have caused or will cause damage.

127.    The damage consists of impairment to the integrity or availability of Apollo's data, programs, systems or information, as well as the misappropriation of the Apollo's Trade Secrets, including the AEMS source code.

128.    The damage resulting from Defendants' conduct will be more than $5,000 in any one-year period.

129.    The foregoing are violations of 18 U.S.C. § 1030(a)(5) and subject Defendants to a civil action for compensatory damages, injunctive relief, or other equitable relief pursuant to 18 U.S.C. § 1030(g).

## COUNT V
## EXTORTION BY THREAT OF DAMAGE TO PROTECTED COMPUTER SYSTEM
## 18 U.S.C. § 1030(a)(7)

130.    Apollo repeats the allegations of Paragraphs 1 through 102 as though fully set forth herein.

131.    Defendants, with intent to extort from Apollo a thing of value, namely money and ownership of Apollo's proprietary AEMS software, have transmitted communications, to one or more of Apollo's directors, including threats to cause, and continue to cause, damage to Apollo's protected computer system.

132.    Specifically, unless Apollo agreed to Defendants' extortionate demands that Apollo (1) renounce ownership of AEMS; (2) take a license from 100x or pay $3,000,000 to acquire it, or abandon all use; and (3) pay $217,000 for transition services, Defendants have threatened to deny Apollo access to AEMS and its source code, to disruptively discontinue services, and to cut off Apollo from AEMS.

133.    The foregoing is a violation of 18 U.S.C. § 1030(a)(7) and subjects Defendants to a civil action for compensatory damages, injunctive relief, or other equitable relief pursuant to 18 U.S.C. § 1030(g).

**COUNT VI**
**DEFEND TRADE SECRETS ACT OF 2016**
**18 U.S.C. § 1836**

134.    Apollo repeats the allegations in Paragraphs 1 through 102 as though fully set forth herein.

135.    Defendants misappropriated trade secrets belonging to Apollo related to its business, and its goods and services, which are used and intended for use in interstate and foreign commerce.

136.    As referenced above, Defendants have accessed and used AEMS, cut off access to the source code, and threatened to cut off access to AEMS entirely, and used or threatened to use the same for their own purposes in soliciting Apollo's competitors or other third parties.

137.    Defendants have wrongfully taken possession of AEMS and the underlying source code, which contain or constitute a wide range of confidential information (collectively referred to herein as the "Trade Secrets").

138.    All such Trade Secrets are subject to reasonable efforts to maintain secrecy, have independent economic value, are confidential, are not publicly known or available, and are extremely proprietary to Apollo.

139.    Plaintiffs took reasonable steps to maintain the secrecy and limit the use of and access to the Trade Secrets.  Plaintiffs did not distribute the Trade Secrets publicly and took significant measures to prevent competitors from accessing the same.  Such efforts included, among other things, requiring persons to have knowledge of passwords and access codes prior to gaining access to the software.

140.    The Defendants knew they were subject to a duty to maintain the secrecy of and limit the use of the Trade Secrets.

141.    The Defendants have misappropriated the Trade Secrets by acquiring them through the improper means of abusing its position of trust, unlawfully blocking Apollo's access, and copying them surreptitiously from Apollo's servers to 100x's own servers.

142.    Defendants' acts of misappropriation were willful and malicious.

143.    Defendants' acts of misappropriation have caused irreparable injury to Apollo and will continue to cause irreparable injury to Apollo if the Defendants are not restrained by this Court from further violating Apollo's trade secret rights.

144.    As a result of the above-described willful and malicious appropriation of Apollo's trade secrets, Apollo is entitled to an injunction and further appropriate relief as set forth in 18 U.S.C. § 1836, *et al.*, subject to the discretion of this Court, damages, and an additional award of up to two times the amount of compensatory damages.

**COUNT VII**
**MISAPPRIATION OF TRADE SECRETS**
**(FLORIDA TRADE SECRETS ACT)**

145.    Apollo repeats the allegations in Paragraphs 1 through 102 as though fully set forth herein.

146.    The Trade Secrets were at all relevant times trade secrets of Apollo within the meaning of § 688.002(4), the Florida Trade Secrets Act.

147.    The Trade Secrets derived independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

148.    The Trade Secrets also were the subject of efforts that were reasonable under the circumstances to maintain its secrecy.  Such efforts included, among other things, requiring

persons to have knowledge of passwords and access codes prior to gaining access to the software.

149.    Defendants acquired the Trade Secrets by improper means as described above.

150.    The Trade Secrets were secret and, having been developed internally, were not known outside of Apollo's business.

151.    Apollo took substantial measures to guard the secrecy of the information as described above.

152.    The Trade Secrets are of substantial value to Apollo and, if misappropriated, to Apollo's competitors.

153.    As described above, Apollo made substantial efforts and expended substantial amounts of money and time in developing the Trade Secrets.

154.    Absent Defendants' unlawful taking, Apollo's competitors would have substantial difficulty developing the same Trade Secrets.

155.    Section 688.003 permits injunctive relief. Specifically, "[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order."

156.    As a direct and proximate result of Defendants' misappropriation of the Trade Secrets, Apollo has been damaged in an as yet undetermined amount but in excess of $5,000.

**COUNT VIII**
**TRESPASS TO CHATTEL**

157.    Apollo repeats the allegations in Paragraphs 1 through 102 as though fully set forth herein.

158.    Apollo owned and lawfully possessed chattels—AEMS, the Apollo Systems, and the Apollo Records.

159.    Defendants intentionally and without justification interfered with Apollo's ownership and possession by blocking Apollo and their prospective users from accessing the chattels, modifying or deleting with the copy of AEMS that existed on Apollo's servers, placing information related to third parties on the Apollo Systems without Apollo's knowledge or consent, using the Apollo Systems to manage data and network services for third parties without Apollo's knowledge or consent, and threatening to destroy, deny, or limit Apollo's access to AEMS.

160.    As a direct and proximate result of Defendants' trespass of the chattels, Apollo has been damaged in an amount exceeding $5,000, but as yet undetermined, and faces additional damages exceeding that amount.

## COUNT IX
## CONVERSION

161.    Apollo repeats the allegations in Paragraphs 1 through 102 as though fully set forth herein.

162.    Defendants wrongfully deprived Apollo of access to and control over the AEMS source code.

163.    Defendants have wrongfully threatened to deprive Apollo of access to and control of AEMS and the AEMS source code.

164.    Defendants refused Apollo's demand that Defendants return the AEMS source code to Apollo.

165.    As a direct and proximate result of Defendants' wrongful deprivation, Apollo has been or will be damaged in an undetermined amount exceeding $5,000.

## COUNT X
## BREACH OF AGREEMENTS

166.    Apollo repeats the allegations in Paragraphs 1 through 102 as though fully set forth herein.

167.    Apollo is the true and correct owner of the AEMS source code.

168.    In working with Defendants, Apollo granted Defendants an express or implied license to use and access AEMS with the understanding that Defendants would operate in good faith and service Apollo for the benefit of Apollo.

169.    Defendants' subsequent actions preventing Apollo from accessing its property, or threatening to do so, and claiming ownership of the same constitute breach of these agreements.

170.    Defendants also wrongfully used the Apollo System to conduct business on behalf of third parties without Apollo's knowledge or consent, in violation of the parties' express or implied agreements regarding the provision of IT services by 100x.

171.    Defendants also failed to make payments to third-party service providers even though Apollo provided Defendants with money to do so, in violation of the parties express or implied agreements regarding the provision of IT services by 100x.

172.    Apollo has been, or will be, damaged by Defendants' breach of these express or implied agreements.

## COUNT XI
## BREACH OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

173.    Apollo repeats the allegations in Paragraphs 1 through 102 as though fully set forth herein.

174.    Apollo is the true and correct owner of AEMS.

175.    Defendants obtained AEMS through wrongful means, and Defendants did so while knowing that these systems and records were the rightful property of Apollo.

176.     Defendants attempted to leverage a windfall payment and ownership of AEMS from Apollo through their wrongful appropriation of AEMS and threatened to disrupt Apollo's access to the Apollo Systems and the Apollo Records.

177.     Upon information and belief, Defendants have marketed and continue to market AEMS to Apollo's competitors to the detriment of Apollo.

178.     Upon information and belief, Defendants have solicited or attempted to solicit business from Apollo's competitors, falsely representing that Defendants are the owners of AEMS and capable of providing services for those competitors through use of AEMS.

179.     Defendants have thus engaged in prohibited deceptive and unfair trade practices, in violation of Fla. Stat. § 501.201, *et seq*.

180.     Apollo has been and will continue to be damaged by Defendants' breach of the FDUTPA and is entitled to injunctive relief.

## COUNT XII
## BUSINESS COMPULSION & DURESS

181.     Apollo repeats the allegations in Paragraphs 1 through 102 as though fully set forth herein.

182.     Apollo was forced to agree to the TSA under business compulsion or duress as a result of Defendants' threat to terminate its access to AEMS, the Apollo Systems, and the Apollo Records.  If Apollo had not agreed to 100x's demand for $217,000, it would have functionally lost the ability to operate its business for a period of time if 100x carried out its threat to cease to render "further service, support, or hosting" to Apollo.

183.     Apollo only paid $217,000 to 100x due to the pressure and exigent circumstance that 100x would cease to render "further service, support, or hosting" to Apollo and for no other

reason.  The pressure was of such an extent that it negated the voluntariness of any such payment to 100x.

184.    Apollo did not subsequently ratify the TSA or the $217,000 payment made pursuant to the TSA.

185.    As a direct and proximate result of the egregious actions and positions taken by 100x, Apollo overpaid 100x in the amount of $217,000 and has been damaged in said amount.

186.    The TSA and the payments made thereunder are voidable, and Apollo is entitled to a return of all payments it made to 100x pursuant to the TSA.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for the following relief:

1.    Pursuant to 28 U.S.C. § 1030, 18 U.S.C. §§ 1836 & 1830, and Sec. 688.003, Fla. Stat.,

    a.    That all issues so triable be tried to a jury;

    b.    An order declaring that Apollo is the sole owner of any and all copyrights in AEMS and all underlying source code related thereto;

    c.    An order declaring the TSA void as executed under business compulsion or duress, and returning to Apollo all payments it was forced to make to 100x under this agreement;

    d.    A permanent injunction:

        i.    Requiring Defendants to return any and all copies of AEMS or the Apollo Records in their possession to Plaintiffs, including without limitation all source code;

        ii.    Enjoining Defendants from in any way disclosing, publishing, transferring, copying, uploading, or in any way revealing or communicating any part of AEMS or the Apollo Records, including

without limitation source code, or data, to any party or entity other than Apollo; and

iii.    Enjoining Defendants from taking any action to disrupt, deny, discontinue, or otherwise interfere with Apollo's access to, and from taking any action to modify, destroy, or otherwise interfere with AEMS (including source code), the Apollo Systems, or the Apollo Records or from denying Apollo the ability to fully access the same.

e.    For a judgment against Defendants for damages, enhanced damages, and costs of this action; and

f.    For any other such relief as this Court deems necessary and just.

Dated: June 6, 2017

Respectfully submitted,

s/ *Thomas E. Scott*
Thomas E. Scott (FBN 501298)
Thomas.Scott@csklegal.com
**COLE, SCOTT & KISSANE, P.A.**
9150 South Dadeland Blvd., Suite 1400
Miami, FL 33156
Telephone: 305.350.5385
Facsimile: 305.373.2294

s/ *Dale Cendali, P.C.*
Dale Cendali, P.C.*
Email: dale.cendali@kirkland.com
Joseph Loy*
Email: joseph.loy@kirkland.com
Daniel Bond*
Email: dbond@kirkland.com
Phillip Hill*
Email: phil.hill@kirkland.com
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
United States
Telephone: 212.446.4800
Fax: 212.446.4900

* *Pro Hac Vice forthcoming*

*Counsel for Plaintiffs Apollo Aviation*
*Group, LLC, AAG Capital Markets, LLC,*
*and Apollo Aviation Management Limited*